GRITT, JUDGE:
Claimant contractor, TMARO Corporation, brought this action upon a construction contract entered into with the respondent, Higher Education Policy Commission, for the construction of the Gaston Caperton Center, a facility for Fairmont State College. The Gaston Caperton Center is located in Clarksburg, Harrison County. The original contract cost for the project is in the amount of $5,942,000.00. Claimant asserts that it has not been paid under the terms of its contract for all of the work it performed; that it incurred additional costs for the HVAC system; and that respondent is wrongfully withholding the retainage on the contract, all to the detriment of the claimant. The total amount of the claim before the *245 Court is in the sum of $98,970.00. The Court heard this claim over a three day period in April 2002 during which time the Court and the parties took a view of the Gaston Caperton Center. The Court is of the opinion to grant an award in this claim for the reasons set forth herein below.
Claimant TMARO Corporation, hereinafter referred to as TMARO, and respondent Higher Education Policy Commission, hereinafter referred to as HEPC, entered into a contract on November 11, 1997, for the construction of a classroom building known as the Gaston Caperton Center which is part of the extended campus of Fairmont State College. Construction began in the spring 1998 with substantial completion occurring on June 24,1999. During construction, various issues arose on the part of TMARO for certain change proposals which now constitute Count I of this claim. Count II of the claim was an issue of potable water on the project which count was withdrawn by TMARO at the start of the hearing. After the completion of punch list items, final completion was to occur forty-five days later on or about August 13, 1999. At that time there were problems on the project with the balancing of the HVAC (heating, ventilation, and air conditioning) system for the building. Thereafter issues arose regarding the HVAC system which constitute Count III. HEPC maintained that it would withhold the retainage on the contract until such time the HVAC system was operating properly. HEPC has continued to deny payment of the retainage to TMARO. The amount ofthe retainage constitutes CountIV ofthis claim.
HEPC takes the position that TMARO has been paid in full for its work on the Gaston Caperton Center; that liquidated damages should be assessed against TMARO since all of its work on the project was not completed until August 2001; and further, that there should be a setoff awarded to HEPC on amounts it asserts is owed by TMARO to it for additional work performed by its architectural firm and for certain engineering work which became necessary after the project was substantially completed.
The Court will address this claim for purposes of this opinion by each Count set forth by the TMARO.
COUNT I
During construction of the Gaston Caperton Center, TMARO submitted various change proposal requests for additional payments to be made for work performed beyond the scope of the project. The change proposals were reviewed by HEPC’s architectural firm on the project, Gates Calloway Moore & West, and were denied for payment. Each of these change proposals is discussed herein below:
Change ProposalNo. 015 - The subcontractor for excavation on this project was Laurita Excavating. It mobilized its equipment at the project site in the spring 1998; however, on April 29,1998, TMARO was directed by the representative ofthe architectural firm, Gates Calloway Moore & West, to halt excavation work because the soil compaction required by the specifications in the contract could not be met. The soil was determined to be unsuitable thus creating problems with stabilization for the parking lot. At that time the engineers determined that it would be necessary to design a “bridge layer” to resolve the soil issue. Laurita Excavating had to decide whether to leave its equipment on the project perhaps causing an additional cost to HEPC for idle equipment charges or to remove the equipment from the project site until the engineers determined a solution to the unsuitable soil problem. Laurita *246 Excavating made the decision to move the equipment off site whereupon there is an outstanding charge for remobilization of the equipment from and back to the project site. HEPC denied the remobilization charge for which TMARO now claims the amount of $1,560.00.
HEPC asserts that the remobilization claim should be denied as the subcontract was a lump sum bid; therefore, there is no one to determine whether or not the bid was based upon additional remobilizations.
The Court is of the opinion that the remobilization charge is a reasonable charge for the subcontractor Laurita Excavating. The Court is well aware that idle equipment charges would greatly exceed the remobilization charge put forth by the subcontractor herein. It was estimated that idle equipment charges for four pieces of excavating equipment would be approximately $800.00 per day3 and the equipment would have been idle for at least eight days. It is unreasonable to assume that a subcontractor would plan to have equipment at a construction site for periods when it is not in use and not need that equipment for other contract obligations. Therefore, the Court is of the opinion to make an award in the amount of $ 1,560.00 for Change Proposal No. 015.
Change Proposal No. 034 - The construction site for this project was on acreage that had been the site of an old hospital which had been razed for a parking lot at some time in the past. Therefore, TMARO’s subcontractor for excavation, Laurita Excavating, encountered foundation walls, brick, terra-cotta pipes, and other debris during excavation. Although the contract documents indicate that undercut excavation should not be beyond the one foot to two foot depth, the architect’s representative on the project approved undercuts to two feet and, in some instances, to three feet. On this particular project the authorization to undercut to three feet was not an unusual occurrence due to the amount of debris encountered during excavation. On the last day (a Friday) that Laurita Excavating was performing its final excavation on the project in an area for the roadway adjacent to the new building, it encountered materials which it determined should be removed. Laurita Excavating was completing its work on the project so it performed a three foot cut based upon previous approvals it had been given in other areas on the project. In fact, the excavation was completed on this date and the excavating equipment was moved off the project site. Since the undercut was below the two-foot approved cut limit specified in the plans for the project, HEPC denied payment for the extra foot of excavation and backfill. It is the position of HEPC that the contractor did not have the required permission to make the additional one-foot cut and should not be paid even though the architect’s subcontractor geotechnical engineering firm, Triad Engineering, may have had authority to approve a cut below the two-foot level, and did approve the undercut to three feet. HEPC asserts that Triad did not have authority to give this approval. TMARO makes a claim in the amount of $1,966.00 for this extra foot of excavation and backfill. The Court has determined that the excavating company performed the undercut in good faith and reliance upon personnel on the project from Triad Engineering. It is not the fault of TMARO that the appropriate *247 personnel for HEPC were not available to be consulted on the project on a Friday afternoon while the cut was being made by the subcontractor. For HEPC now to complain that the extra one-foot undercut was made without authority appears to the Court to be an issue totally within HEPC’s own control if the appropriate personnel had been available on the project. It was the responsibility of the architect and the owner, HEPC, to make sure persons appropriate for decision-making purposes were available and were present to make the measurements needed for the calculation of material removed and backfill placed. TMARO acted within reason based upon former decisions made for undercutting areas with debris; therefore, the work performed in the roadway cannot now be said to have been performed without proper authorization. For that reason, the Court makes an award to TMARO in the amount of $1,966.00 for the extra work performed which constitutes Change Proposal No. 034.
Change Proposal No. 047 - The electrical subcontractor for TMARO on this project, William R. Sharpe Incorporated, submitted its bid based upon the electrical drawings provided to it forits bid. These drawings depicted only the electricalportion of the job. During construction, there were two sets of automatic doors with door openers to Ihe building being installed by the glass and glazing subcontractor and these doors required electrical wiring and connections in order to operate. It was not within the scope of that subcontractor to wire the doors so this became the responsibility of the electrical subcontractor. The work performed by the electrical subcontractor involved the installation of four duplex receptacles per door with the necessary wiring to electrical panels located approximately 200 feet from the receptacles at one end of the building. TMARO now claims that this was additional work not within its original bid; therefore, TMARO makes this claim in the amount of $2,971.00 for this work. HEPC asserts that TMARO was responsible for the bid and making sure that all components of the plans were included in its bid on the project. The plans did depict the doors and one would assume that wiring may be needed, but the electrical subcontractor submitted its bid based upon the exact drawings which it received since to guess what other wiring may or may not be needed on the project could have jeopardized its award of the bid. Thus, the subcontractor bid the job based completely upon its set of drawings. The Court has had sufficient experience with construction contract claims heard previously to understand the position of the subcontractor. What is not shown specifically on drawings is not put in a bid. To do otherwise puts a subcontractor at a disadvantage with other bidders. Therefore, the Court has determined that an award be made to TMARO for Change Proposal No. 047 in the amount of $2,971.00 for the extra work performed in wiring the receptacles for the automatic doors.
Change Proposal No. 055a - TMARO alleges that there came a point on the project where HEPC decided to eliminate the installation of a range, range hood and exhaust duct for the range from the contract and, in so doing, it gave a credit to TMARO for this work. The controversy between the parties is that TMARO claims a reasonable credit of $629.00 should be given HEPC rather than the amount of $1,280.00 taken by HEPC. TMARO alleges that this credit taken by HEPC is too much and it claims that the amount of $651.00 is due it for this item. The subcontractor for the duct work was Air Systems Sheet Metal which also installed the duct work for the dryer vent. HEPC based the deduction upon the unit cost for the dryer vent which TMARO claims was not comparing “apples to apples” since the *248 dryer vent was a different installation situation. The dryer vent was an “add on” to the contract and required complicated duct work through a completed wall. The range hood duct required roof penetration which was a “straight shot” and it was not as complicated as the dryer vent installation. The subcontractor’s bid document revealed an amount of $154.13 for the range hood duct work; however, TMARO agrees to a credit amount of $629.00. The Court recognizes that this is a relatively small item, but the credit offered by TMARO appears to be fair and reasonable. Thus, an award in the amount of $651.00 ($1,280.00 less $629.00) is granted for Change ProposalNo. 055 a.
Change ProposalNo. 075 and Change ProposalNo. 086 - These two change proposals will be considered by the Court together as these two claims are based upon the same reasoning by TMARO. In the course of construction of the third floor of the building, TMARO requested permission from the architect to lower the ceiling of the third floor hallway in order to fit the ductwork and other equipment above the ceiling. Permission was granted by the architect. As construction of two conference rooms on this floor was being performed, TMARO determined that the ceilings in these two rooms would need to be lowered as well due to the fixtures required to be placed above the ceiling. The parties agreed that a solution to the lowering of the ceiling resulted in drywall bulkheads being placed in these rooms and in one conference room it was necessary to change an area of clear glass on the window to Spandrel glass (opaque glass with no visibility from outside the building since such a view would be of the duct work and pipes above the ceiling). This extra work resulted in extra expenses to TMARO of $847.00 for drywall bulkheads and $548.00 for the Spandrel glass. There was an abundance of testimony on these two items. TMARO’s position is that the hallway ceiling had to lowered to accommodate the duct work to be installed with the other lines to be placed above the ceiling. When this ceiling was lowered, the sprinkler system pipe would not go directly into the rooms and a diffuser and a VAV box (variable air volume box) would not fit in the space above the planned ceiling level in one room so the lowering of the ceilings was necessary. Further, the VAV box is for the HVAC system, and, as such, it must be accessible to the owner of the building for maintenance purposes, e.g., changing filters. The change proposals submitted by TMARO for work performed for the drywall bulkheads and the Spandrel glass was denied by HEPC.
HEPC asserts that this whole issue was created by TMARO when its subcontractors did not coordinate their work for the installation of the sprinkler system, ducts, electrical conduits, plumbing and any other item which had to run concurrently above the hallway ceiling on the third floor. Since it is the responsibility of the general contractor on a project to submit coordination drawings to the architect, any issues of the many systems that are located above the ceiling having room to fit is the responsibility of the general contractor. On this project, the lack of subcontractor coordination brought about the problem on the third floor so HEPC is not liable to TMARO for any extra work it had to perform in the conference rooms.
The Court had the opportunity to view this situation when it took a view of the building and actually peered into the ceiling area in the conference room with the Spandrel glass issue. Although HEPC vehemently denies the cost for these two change proposals, the Court has determined that TMARO may make a recovery in both instances. Therefore, the Courtmakes an award of $847.00 for Change Proposal *249 No. 075 for the dry wall bulkheads and $548.00 for Change Proposal No. 086 for the Spandrel glass.
Change Proposal No. 083 - This request is for extending the water supply and the drain lines to the ice maker in the kitchen. The work was performed by TMARO’s plumbing subcontractor, Mid-State Mechanical, during the installation of an ice maker. However, the drawings for the plumbing subcontractor did not depict these lines. TMARO alleges that the work was added to the scope of the project for which it now claims the amount of $573.00. HEPC asserts that even though the lines were not on the plans, the subcontractor should have interpreted the fact that an ice maker shown would necessarily imply that there would be piping needed to connect the ice maker to the nearest supply line and drain. Although there was a note on the plans for the ice maker to be connected, TMARO could not know whether that meant providing Ihe plumbing lines or that the connection fittings should be tied in as for other appliances. Therefore, the Court has determined that TMARO may make a recovery for the supply lines to the ice maker in the amount of $573.00 for Change Proposal No. 083.
The award to TMARO for Count I is $9,116.00 plus interest calculated from August 14, 1999, to January 3, 2003, in the amount of $2,648.94 for a total award of $11,764.94.
This concludes the discussion of Count I and the Court will now address Count II very briefly. Count II involved an issue of TMARO’s responsibility for supplying potable water on the project and the issue was resolved by the parties at the beginning of the hearing. Thus, it is no longer a part of this claim.
COUNT III
Count III was brought for the costs incurred by TMARO in its attempts to balance the HVAC (heating, ventilation, and air conditioning) system after completion of the project. TMARO’s subcontractors, Hydrair Balance Company, Mid State Mechanical, and Honeywell, as well as TMARO itself incurred extra costs in addressing the problems with the HVAC system. Hydrair Balance Company (hereinafter referred to as Hydrair) sent a technician to the project site for the purpose of “balancing” the HVAC system. This is normally a final step in the installation of the HVAC system as the technician adjusts each room individually for air flows and water flows so the system works correctly. It was estimated that this effort would take four days; however, TMARO contends that Hydrair’s technician spent an additional 100 hours in an attempt to balance the HVAC system. In actuality, the balancing of the HVAC system was never accomplished on this project. After much wrangling over the HVAC system, both parties engaged the services of independent consultants to find an explanation for the problems with the HVAC system. It was eventually determined that there are design issues with the HVAC system and these problems had not been resolved even at the time of the hearing. However, TMARO contends that it is owed a total of $30,890.00 broken down as $12,887.00 for TMARO and $18,003.00 for its subcontractors for all of its efforts in attempting to meet the demands of HEPC in addressing issues with the HVAC system. HEPC asserts that the documentation for services rendered by Hydrair is insufficient to establish that the technician spent 100 extra hours on this project. It cannot prove or disprove this assertion. Further, HEPC asserts that it bore costs associated with the HVAC system that constitute a set off on this item. Its consultant employed in January 2000, Elwood S. Tower Corporation - Consulting Engineering, hereinafter referred to as Tower *250 Engineering, conducted an inspection of the HVAC system and rendered an expert opinion as to the design and construction of this system. During its inspection Tower Engineering determined that various items that make up the HVAC system were not installed correctly, e.g., some VAV boxes were not properly piped, there were supports missing, the boiler was not piped in accordance with the manufacturer’s specifications, there were unnecessary “elbows” which affected the amount of water circulating creating added pressure in the system; additionally, an impeller did not meet specifications. TMARO made the corrections which the consultant found , but the system still did not function as anticipated. Tower Engineering ultimately concluded that there were design deficiencies in the HVAC system; thus, the system was not able to function properly as anticipated by HEPC.
The HVAC system issues are quite complicated, but the underlying issue is that the HVAC system has been established to the satisfaction of both parties to have design deficiencies. Thus, the only issue is how to determine what amount is due TMARO and whether HEPC is entitled to a set off for the consultant it engaged to inspect the HVAC system, and if so, what amount is fair and reasonable to both parties. Tower Engineering submitted an invoice for its services to HEPC in the sum of $12,263.50 and it estimates that of that amount thirty percent (30%) of the invoice was for time spent in determining those parts of the HVAC system which were not installed correctly by TMARO. The Court is of the opinion that a fair and reasonable set off for the time spent by the consultant on construction issues versus design issues is twenty-five percent (25%) of the consultant’s services to HEPC. The documentation submitted by TMARO for its additional expense appears to the Court to be fair and reasonable. Accordingly, an award is granted to TMARO for the HVAC system expenses in the amount of $30,890.00 less the set off of $3,065.88 for a total award of $27,824.12 for the HVAC system deficiencies.
COUNT IV
In Count IV TMARO claims that it is entitled to recover the full amount of retainage on this contract being held by HEPC. TMARO’s position is that the retainage was being held based upon the inability of TMARO to balance the HVAC system. Once it was determined that the HVAC system had design deficiencies for which TMARO is not responsible, then the retainage became due and owning to it by HEPC. HEPC, however, takes the position that the retainage was being held not only for the issues relating to the HVAC system, but also for the sewer line corrections[2] which had to be made when it was determined that there were sags in the sewer line beneath the building and in the lines on the exterior of the building. The Court notes that there was specific reference to the retainage being held by HEPC for the HVAC system in correspondence to TMARO dated November 30, 1999. It appears to the Court that the punch list items were completed although there were warranty issues, e.g., the floor refinishing being redone for a multipurpose room, and later there was the sewer line issue, but for all intents and purposes the retainage was due at the time that the parties were in agreement that the HVAC system could not be balanced because there were design deficiencies. Warranty issues are not the basis for denying *251 a contractor the retainage on a contract as the purpose of retainage is to provide security for the owner for the completion of the project. In this claim, the Gaston Caperton Center had substantial completion as of June 23, 1999. The building was occupied by Fairmont State College in August 1999 with classes beginning on schedule. The building had been built by HEPC for this purpose. It is generally anticipated that there may be warranty issues after the construction of a building as occurred herein with the roof problems as raised by HEPC and a myriad of other small issues; however, there are maintenance warranties for these items. Warranty issues do not give the owner (HEPC) the right to withhold retainage on the contract when the project is completed. The Court does recognize that the HVAC system problems have been on-going formore than two years. Accordingly, the Court makes an award to TMARO in the amount of $59,252.00 plus interest based upon the dates when Tower Engineering determined that the HVAC system was malfunctioning because of design deficiencies rather than construction issues and taking into consideration the date at which the construction deficiencies were remedied. The date which will be used by the Courtis September 30,2001, for the completion of its work as the record establishes that Tower Engineering submitted its invoice for the consulting services in October2001. Interest will be calculated from October 1,2001, to the date of the issuance of this opinion on January 3, 2003. The interest is calculated in accordance with the terms of the contract at $6,574.09 for a total award of $65,826.09 for the retainage being held by HPEC.
The Court has also considered HEPC’s assertion that it is entitled to liquidated damages in the amount of $750.00 per day from the date of substantial completion on June 23,1999, through December 2001. It bases its position on the fact that the sewer line beneath the building had to be replaced due to sags in the line when the soil gave way under the sewer pipes. This particular work was done by TMARO at its expense and at the convenience of Fairmont State College so as to avoid any disruptions to classes being held in the building. The sewer line replacement work took until December 2001 because TMARO’s subcontractor worked around the class schedule for the college. During this time, HEPC’s architect provided engineering and inspection services for which HEPC now asserts a set off in the amount of $14,766.64 as well as the inconvenience to the college. The additional custodial services needed by the college were reimbursed by TMARO’s subcontractor as the work was accomplished. Notwithstanding that the project was completed in August 1999, the issue of liquidated damages was raised by the owner for the first time when it filed its Answer to the claim. The Court is of the opinion that the issue of liquidated damages was raised too late to be considered as an element of set off in this claim. However, the Court is of the further opinion that HEPC is entitled to a set off of $14,766.64 for its direct costs related to the sewer line correction work and the total award to TMARO will be reduced by this amount.
In accordance with the findings of fact as stated herein above, the Court is of the opinion to and does make an award of $105,415.15 reduced by the set off of $14,766.64 granted to HEPC for a total award of $90,648.51.
Award of $90,648.51.

 TMARO first received notice that there were problems with the sewer line in November 1999.

 Laurita Excavating based this estimate on a McGraw-Hill rental rate blue book publication for a dozer, a roller, an excavator, and a loader.